UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LIONEL SAMPSON,

                Petitioner,                    **DECISION AND ORDER**

      -vs-                                      No. 03-CV-6185

JAMES CONWAY, Superintendent, Attica
Correctional Facility,

                Respondent.
_____

## INTRODUCTION

Petitioner Lionel Sampson ("Sampson") filed this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction on charges of felony murder, intentional murder and burglary in New York State Supreme Court (Monroe County). The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(b).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

At about 5:15 a.m. on July 26, 1996, forty-eight year-old Pamela Wood ("Wood"), a clerk at the Wilson Farms convenience store on North Goodman Street in the City of Rochester, was shot in the head at point-blank range during an attempted robbery.[1] There were no other individuals in the store at that early hour, but Edward Gagner ("Gagner"), who customarily delivered newspapers to the Wilson Farms everyday between 4:15 and 4:30 a.m., had seen a man standing in the telephone booth outside the store at about 4:30 a.m. Gagner described the man's

---

[1] Apparently, Sampson had worked as a cashier at the Wilson Farms store in the past, but his employment was terminated about six months prior to the incident following a heated argument with Wood, the victim.

race as black and estimated that he stood about six-feet, four-inches-tall, weighed over 200 pounds with a muscular build, and was wearing a wind-breaker with a "hoodie" jacket. According to Gagner, the man's head came close to the top of the phone booth although a little space remained.

When the police arrived on the scene, they discovered Wood's dead body slumped in the corner of the store's office. The police also found that the perpetrator had ripped the doors of the cabinet containing the store's video surveillance system off their hinges, pulled out the wires of the VCR, and ransacked the area in the office where the equipment was housed. Apparently, the three surveillance cameras in the store and the one camera in the office had been sending images to a monitor continuously during the incident. Even though the VCR had been disturbed, the monitor still displayed the last image to have been transmitted before the office camera was disconnected: a large man bending over a desk as if he were ripping out the VCR's wires. The man's face was not visible on this image, but it could be seen on the videotape that inexplicably was left in the VCR.

The police evidence technician who recovered the videotape isolated the images from the office camera and transferred them onto another tape. A law enforcement imaging specialist for Eastman Kodak Company extracted the image from the videotape left in the VCR that showed the suspect's face and transferred it to a set of photographs. He then used computer software to enhance the photographs so as to increase the brightness and contrast between the light and dark areas of the images. No alterations were made to the images, however. Finally, the images were printed on high-quality photographic paper in order to eliminate graininess. These photographs showing the likeness of the suspect's face staring up at the surveillance camera then were

broadcast on the local news and printed in the newspaper. Four individuals–Rosemary Arnold ("Arnold"), Lynette Cook ("Cook"), April Huntley ("Huntley") and Corey Butler ("Butler")– who had either known or worked with Sampson at Wilson Farms saw the newscast and recognized him as the man on the videotape. Butler, Arnold and Cook approached the police concerning their recognition of Sampson and were separately shown print photographs of the suspect's likeness that had been televised on the news. All three individuals confirmed their earlier identifications based upon what they had seen in the media. (Hunt did not contact the police at that time, but she did testify at trial, along with Butler, Arnold and Cook, that Sampson was the individual on the videotape.)

In the days following the murder, Sampson contacted Andre Dade ("Dade"), who had hired him to work as a cashier at Wilson Farms, and asked him if he had seen the news reports. When Dade replied affirmatively, Sampson confided that he believed that the police thought he committed the Wilson Farms crime and asked Dade for money. Dade refused this request and several other requests Sampson subsequently made to him for money.

On August 8, 1996, about a week after Butler, Arnold and Cook had come forward and identified Sampson as the perpetrator, the police conducted a surveillance of Sampson's residence 732 Genesee Street. Sampson was arrested later that night outside of a grocery store on Genesee Street where the police had traced Sampson through a phone call. As he was being handcuffed, Sampson mused, "[H]ow did you guys find me?" T.971-75. 979-84.[2]

Sampson was indicted on four counts: intentional murder, felony murder, depraved indifference murder and second degree burglary. He was tried before a jury in New York State

---

[2] Citations to "T.__" refer to the trial transcript.

Supreme Court (Monroe County). By the time of trial, Sampson had changed his appearance: he was clean-shaven except for a mustache, had shorter hair and had lost weight. Sampson's brother, Vernon Williams ("Williams"), testified for the defense that he did not recognize the photograph of the suspect shown on television as Sampson. Sampson's friend, Archie Donaldson ("Donaldson"), testified that the man in the videotape did not look "exactly like [Sampson]." T.1085, 11113-14. Barbara Pratt ("Pratt") testified for the defense that the suspect depicted on the newscasts was a man named Leonard Holliman, with whom she had a "horrible" romantic relationship during 1996. Pratt described Holliman as being built like the "Pillsbury Doughboy" and police photographs showed him to be a mere five-feet, four-inches tall. T.1137, 1152. Sampson, in contrast, was six-feet, two-inches-tall and very muscular.

In the videotape of the incident shown to the jury at trial, a black male armed with a gun and a white female are seen entering the office of the Wilson Farms. The man is wearing a "hoodie" and gloves and is much larger than the woman. The two struggle near the safe and the man places a bag and a handgun on the desk. The man picks up the gun again and the woman is next seen lying in the corner, apparently shot. The man leaves the office momentarily. When he returns, he looks up in the general direction of the surveillance camera and realizes that he has been caught on video. He then pulls the video equipment out of the cabinet, disabling the surveillance system.

The jury returned a verdict convicting Sampson of intentional murder, felony murder and second degree burglary as charged in the indictment. He was not convicted of the depraved indifference murder charge. Sampson was sentenced to an indeterminate term of imprisonment of twenty-five years to life on each murder count and to a determinate term of fifteen years on the

burglary charge.

The Appellate Division, Fourth Department, of New York State Supreme Court, unanimously affirmed his conviction. *People v. Sampson*, 289 A.D.2d 1022 (App. Div. 4th Dept. 2001). The New York Court of Appeals denied leave to appeal. *People v. Sampson*, 97 N.Y.2d 733 (N.Y. 2002). Sampson challenged the performance of his appellate counsel in an application for a writ of error *coram nobis* which was denied. *People v. Sampson*, 300 A.D.2d 1154 (App. Div. 4th Dept. 2002).

Sampson filed a petition for a writ of habeas corpus in this Court on April 16, 2003, in which he raised eight grounds for relief. *See* Docket #1. On September 2, 2003, he sought and obtained a stay of his habeas petition in order to return to state court for the purpose of exhausting additional claims of ineffective assistance of appellate counsel. *See* Docket ##9, 11. On March 30, 2005, Sampson filed an amended petition for habeas in this Court. *See* Docket #15. Respondent filed a memorandum in opposition to the amended petition on May 23, 2005, arguing that a number of Sampson's claims were unexhausted or procedurally defaulted. *See* Docket #16. On July, 7, 2005, Sampson filed a reply memorandum of law in which he addressed respondent's exhaustion and procedural default arguments and set forth in more detail the claims that he had returned to state court to exhaust in his second *coram nobis* application. *See* Docket #17.

For the reasons set forth below, the petition is denied.

# DISCUSSION

**Exhaustion**

A petitioner must exhaust all available state remedies either on direct appeal or through a collateral attack of his conviction before he may seek a writ of habeas corpus in federal court. 28 U.S.C. § 2254(b); *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995). The exhaustion of state remedies requirement means that the petitioner must have presented his constitutional claim to the highest state court from which a decision can be obtained. *See Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000) (citing *Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir. 1991)). A claim is properly exhausted when the state court is fairly apprised of the claim's federal nature and of the factual and legal premises underlying the claim. *Grey*, 933 F.2d at 119-20.

The Court has reviewed Sampson's submissions to the courts below and concludes that all of the claims raised in the original habeas corpus petition and amended habeas corpus petition are fully exhausted. *See Daye v. Attorney General of New York*, 696 F.2d 186, 194 (2d Cir. 1982) (*en banc*); *accord*, *e.g.*, *Strogov v. Attorney General*, 191 F.3d 188, 191 (2d Cir. 1999). An extended discussion of the issues of exhaustion would be contrary to the interests of judicial economy, and all of Sampson's claims may be disposed of readily on the merits.

**Standard of Review**

To prevail under 28 U.S.C. § 2254, as amended in 1996, a petitioner seeking federal habeas review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or resulted in a decision that was

based on an unreasonable factual determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

**Merits of the Petition**

**Ground I:     The verdict is against the weight of the evidence.**

Sampson first claims that his conviction should be overturned on the basis that the verdict is against the weight of the evidence. However, challenges to the weight of the evidence supporting a conviction are not cognizable on federal habeas review. *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996). In contrast to the intermediate appellate courts in New York state, the federal courts may not independently "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony." *People v. Bleakley*, 69 N.Y.2d 490, 495 (1987). Accordingly, Sampson's weight-of-the-evidence claim must be dismissed as not cognizable on habeas review.

**Ground II:     Improper admission of identification testimony**

Sampson contends that the trial court erred in allowing the identification testimony of civilian witnesses and in admitting the out-of-court identification of him by these witnesses. The Appellate Division concluded that Sampson failed to object to the admission of the evidence at the time of trial and thereby failed to preserve this claim for review and that, in any event, the claim was without merit. Respondent is correct that this claim is procedurally defaulted because the state court relied upon an adequate and independent state ground in concluding that it was unpreserved for appellate review. *Harris v. Reed*, 489 U.S. 255, 261 (1989) (Federal habeas review of a state conviction is prohibited where the state court judgment is based on an "adequate and independent state ground," such as a procedural bar rule.). Samspon has not attempted to

demonstrate–nor can he on the record before this Court–cause for the default and prejudice attributable thereto, or that failure to consider the federal claim will result in a fundamental miscarriage of justice. *Id.* (citations omitted); *see also*, *e.g.*, *Schlup v. Delo*, 513 U.S. 298, 314-16 (1995). Sampson cannot overcome this procedural default, and therefore the claim is barred from habeas review.

**Ground III:  The in-court identification testimony was the subject of bolstering by the prosecution.**

Sampson argues that the prosecution improperly bolstered the in-court identification testimony of several witnesses by having the witnesses testify as to their prior out-of-court identification claims. The Appellate Division also found this claim to be unpreserved for review because Sampson failed to object to the admission of this evidence. Respondent is correct that this claim is subject to a procedural default which Sampson is unable to overcome given the absence of cause and prejudice and the fact that a fundamental miscarriage of justice will not occur if the Court fails to consider the claim. *See Schlup,* 513 U.S. at 314-16. Accordingly, this claim is barred from habeas review.

**Ground IV: Compromise of jury secrecy**

During deliberations, the jury requested that it be permitted to view isolated frames from the surveillance videotape. As a means of accommodating that request, a videotape operator and court deputy were permitted to enter the jury room in order to operate the videotape player and retrieve the requested images. Defense counsel proposed this solution, and Sampson agreed to it in open court. Sampson now contends that allowing these individuals into the jury room for the limited purpose of assisting the jurors in viewing the videotape violated the secrecy of the deliberation process such that his conviction was unconstitutionally obtained. On direct appeal,

the court held that Sampson waived his objection by consenting to the procedure used and, in any event, his contention lacked merit.

In *Clark v. United States*, the Supreme Court explained that the need for privacy and secrecy during the jury deliberation process derives from the risk that the "[f]reedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world." 289 U.S. 1, 13 (1933) (Cardozo, J.); *accord*, *e.g.*, *United States v. Thomas*, 116 F.3d 606, 619 (2d Cir. 1997), *vacated on other grounds*, 531 U.S. 1062 (2001); U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . "), U.S. CONST. amend XIV. "[I]f an intrusion into the jury's privacy has, or is likely to have, the effect of stifling such debate, the defendant's right to trial by jury may well have been violated." *Johnson v. Duckworth*, 650 F.2d 122, 125 (7th Cir. 1981) (also noting that "jury privacy is not a constitutional end in itself; it is, rather, a means of ensuring the integrity of the jury trial"). Thus, the purpose of the rule precluding persons other than jurors from being in the jury room during the jury's discussions is twofold: it protects the privacy of the deliberative process and prevents the inhibiting effect that such outsiders would have on the vigorous discourse necessary to the jury's fact-finding duties. *See Clark*, 289 U.S. at 13; *Thomas*, 116 F.3d at 619.

In *New York v. Hill*, the Supreme Court reiterated that "[w]hat suffices for waiver depends on the nature of the right at issue." 528 U.S. 110, 114 (2000) (holding that defense counsel can effectively waive a defendant's right to be brought to trial on a specified date under the Interstate Agreement on Detainers). The *Hill* Court noted the difference between "certain fundamental rights," which the defendant must personally waive, and other "decisions pertaining

to the conduct of the trial," which the attorney may make and to which the defendant is deemed bound. *Id.*; *accord*, *e.g.*, *Clark v. Stinson*, 214 F.3d 315, 324 (2d Cir. 2000). Examples of the first category include the Sixth Amendment right to representation by counsel and the Fifth Amendment right to plead not guilty. *See id.* In the latter class fall decisions by counsel concerning what arguments to pursue, what evidentiary objections to raise, and what concessions to make regarding the introduction of evidence. *See id.*

Viewing Sampson's allegations through the lens of the foregoing case law, the Court has no difficulty concluding that the process leading to his conviction was not corrupted in any way. First, as the Seventh Circuit noted in *Duckworth*, jury privacy is not a constitutional end in and of itself, and Sampson does not explain how he was prejudiced by this alleged "piercing of the veil" of jury secrecy. Sampson does not allege that the jury continued to deliberate while the videotape operator and court deputy were preparing the videotape for viewing. Nor does Sampson contend that the videotape operator and court deputy acted improperly while they were in the jury room, let alone that they overheard or participated in any of the jury's discussions. Notably, Sampson does not assert that these two individuals did anything other than cue up and play the surveillance videotape for the jury and then leave.

Turning to the issue of Sampson's waiver, the Supreme Court has held that the Sixth Amendment right to a public trial is subject to waiver, provided that any such waiver is made knowingly and voluntarily. *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938). Here, Sampson does not dispute that he personally consented to this procedure in open court after his own attorney suggested it. Thus, Sampson does not have a credible basis for denying that he consented to the extremely limited intrusion of two non-jurors into the jury room during deliberations.

**Ground V:    Failure to comply with the notice requirements of New York Criminal Procedure Law § 710.30**

Sampson claims that the trial judge should have excluded his statement to the police at the time of his arrest, "Damn, how did you guys find me?", because the prosecution failed to comply with the notice requirements of New York Criminal Procedure Law ("C.P.L.") § 710.30 (prosecution must provide notice to defendant within 15 days of arraignment of intention to use defendant's statement as evidence at trial).

This Court may entertain an application for a writ of habeas corpus only if Sampson's custody violates the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 2254(a). Federal courts do not have the power to correct a misapplication of state law unless that misapplication itself violates federal law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002). Sampson's claim pursuant to C.P.L. § 710.30 does not present a federal question. *E.g.*, *Ventura v. Artuz*, 2000 WL 995497, No. 99-Civ-12025 (S.D.N.Y. July 19, 2000) (violation of C.P.L § 710.30 is "clearly a state law issue and is not cognizable under federal habeas review"); *Smith v. Artus*, 2005 WL 1661104, at *7, No. 03-Civ-9819 (S.D.N.Y. July 14, 2005) (same). Therefore, the Court is precluded from reviewing Sampson's claim relating to alleged violations of C.P.L. § 710.30.

**Ground VI:    Erroneous exclusion of evidence of petitioner's intent to surrender**

As part of the defense case, counsel proffered the testimony of Sampson's brother, Vernon, that Sampson told him–allegedly at some point prior to his arrest–that he was going to turn himself in to the police after Vernon's wedding. Counsel argued that this evidence was admissible as a state-of-mind exception to the hearsay rule. Counsel urged that the prosecution opened the door to this line of testimony, pointing to the prosecution's argument that evidence of

Sampson's request for money from Dade and his question at the time of his arrest about how the police managed to find him demonstrated Sampson's plan to avoid capture and his consciousness of guilt. According to the defense, evidence of Sampson's intent to surrender was admissible as an exception to the hearsay rule because it was being offered to demonstrate his state of mind at the time of the incident–that is, his then-current intent to surrender in the future. The trial court excluded the evidence, finding that it was being offered to prove the truth of the matter asserted therein and, as a result, constituted self-serving hearsay. T.1087-91.

As an initial matter, the admissibility of evidence presents a question of state law. Even if the trial court's ruling was erroneous as a matter of New York law, this alone would not be sufficient to merit federal habeas relief. *See Estelle v. McGuire*, 502 U.S. at 67. The relevant inquiry with respect to federal law is whether the challenged evidentiary rulings so infected the proceedings with unfairness as to render the trial fundamentally unfair. *See Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998).

The Court agrees with the trial court's conclusion that this self-serving hearsay evidence should not have been admitted. Because it was lacking in circumstantial guarantees of trustworthiness, it did not meet the test of reliability. Moreover, the Court cannot find that the evidence was of even marginal importance to the trial. In truth, the testimony easily could have cut against Sampson's cause since the jury also could have interpreted a plan to surrender as showing consciousness of guilt. Finally, Sampson has not demonstrated a shred of prejudice as a result of the trial court's evidentiary ruling on this issue. Accordingly, this claim does not provide a basis for habeas relief.

**Ground VII:  Failure to issue a "circumstantial evidence" charge**

Sampson contends that the alleged evidence of his guilt was wholly circumstantial and that therefore the trial court erred in refusing to give what is commonly referred to in New York law as a "moral certainty" charge, *see People v. Roldan*, 88 N.Y.2d 826, 827 (N.Y. 1996). According to Sampson, the images extracted from the surveillance videotape from the witnesses identified him as the perpetrator essentially were "circumstantial evidence" of what was depicted on the original videotape. On direct appeal, the Appellate Division rejected this claim as without merit.

Under New York law, a circumstantial evidence jury charge is only required, at the defendant's request, when the evidence against a defendant is comprised *solely* of circumstantial evidence. *E.g.*, *People v. Daddona*, 81 N.Y.2d 990, 992 (N.Y. 1993) ("Whenever a case relies wholly on circumstantial evidence to establish all elements of the charge, the jury should be instructed, in substance, that the evidence must establish guilt to a moral certainty."). However, where a charge is supported with both circumstantial and direct evidence, the court need not so instruct the jury. *Id.*

Sampson's argument, albeit creative, has no sound basis in law or logic. Here, four witnesses identified Sampson as the person depicted on the surveillance videotape. This identification evidence was not rendered circumstantial by the fact that the witnesses identified Sampson after viewing images extracted from the original surveillance videotape. Because these identifications constituted direct evidence of Sampson's guilt, a circumstantial evidence charge was not warranted in this case. Therefore, this claim affords no basis for habeas relief.

**Ground VIII:   Ineffective assistance of appellate counsel**

    **A.    Legal standard**

In order to prevail on a claim of ineffective assistance of counsel within the framework established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner must satisfy a two-part test. First, a petitioner must demonstrate that counsel's performance was so deficient that counsel was not functioning as "counsel" within the meaning of the Sixth Amendment to the Constitution. *Id.* at 688. In other words, a petitioner must show that his attorney's performance "fell below an objective standard of reasonableness." *Id.* Second, a petitioner must show that counsel's deficient performance prejudiced him. *Id.* at 694. To establish the "prejudice" prong of the *Strickland* test, a petitioner must show that a "reasonable probability" exists that, but for counsel's error, the outcome of the trial would have been different. *Id.* at 694.

Although the *Strickland* test was formulated in the context of evaluating the effectiveness of trial counsel, the same standard applies to claims regarding the performance of appellate counsel. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citing, *e.g.*, *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992)). Appellate counsel need not present every non-frivolous argument that could be made on petitioner's behalf. *Mayo*, 13 F.3d at 533. Moreover, reviewing courts should not employ hindsight to second-guess an appellate attorney's choices concerning strategy. *Mayo*, 13 F.3d at 533; *see also Jones v. Barnes*, 463 U.S. 745, 754 (1984). Omission of insignificant claims that will likely be unsuccessful does not prejudice a defendant. *See Mayo*, 13 F.3d at 534 ("To establish prejudice in the appellate context, a petitioner must demonstrate that 'there was a "reasonable probability" that [his] claim would have been successful . . . .'") (alteration in original) (quoting *Claudio v. Scully*, 982 F.2d at 803)).

**B.    Alleged grounds of ineffectiveness**

### 1.      Failure to challenge reasonable doubt instruction

Sampson asserts that "appellate counsel failed to raise that the trial court in the instruction to the jury relative to the 'deliberation duties' charged that each juror had a duty 'to determine whether that juror has, in fact, a reasonable doubt of the defendant's guilt as the term as defined under our law.'" Petition at 7, ¶12 (Docket #1). At trial, the court's charge on reasonable doubt read, in part, as follows:

> A doubt of a defendant's guilt, to be a reasonable doubt, must arise either from the nature and the quality of the evidence in this case or from the lack or insufficiency of the evidence in this case. Therefore, the first duty of each juror is to consider and weigh all the evidence in this case and decide which you believe is credible and worthy of your consideration. *The next duty of each juror is to determine whether that juror has, in fact, a reasonable doubt of the defendant's guilt as the term is defined under our law*.

T.1285-86 (emphasis supplied).

Sampson argues that the italicized language in the charge impermissibly diverged from the "approved language 'a doubt for which *some reason can be given*.'" (emphasis supplied). Although New York's Pattern Jury Instructions and state appellate courts condone the "some reason" language, the federal courts have viewed it with wariness. In *Vargas v. Keane*, the Second Circuit explained that "instructions tying 'reasonable doubt' to a doubt 'for which you can give a reason'–or, in the more passive formulation, 'for which a reason can be given'–may well be unwise, because of the possibility that such an instruction will 'intimidate a juror by suggesting that he may be called upon to explain his doubts.'" 86 F.3d 1273, 1277 (2d Cir. 1996) (quoting *United States v. Davis*, 328 F.2d 864, 867 (2d Cir. 1964) (rejecting challenge to instruction defining reasonable doubt as "a doubt for which you can give a reason")); *see also Chalmers v. Mitchell*, 73 F.3d 1262,1267 (2d Cir. 1996) (considering constitutionality of a state

trial court instruction defining reasonable doubt as "a doubt for which some good reason can be given" and holding that the "good reason" language constituted an "incorrect statement of law which should never be made").

Given these precedents, it is clear that there was no error of federal constitutional magnitude in the instruction given at Sampson's trial. In fact, because it omitted the problematic "some reason" language, it arguably was more fair to the petitioner.

### 2. Failure to argue that the trial court should have conducted *Daubert* hearing

Sampson suggests that appellate counsel should have argued that it was error to not to hold a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1293), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to determine the admissibility of the images from the surveillance videotape. According to Sampson, the prosecution's law enforcement imaging specialist who extracted the images from the videotape was an "expert witness" who used "special 'Adobe Photo Shop' computer program equipment" to prepare the videotape shown at trial. The defense expert witness, however, testified at trial that there was nothing improper about what the prosecution's imaging specialist had done with respect to the preparation of the videotape. Moreover, defense counsel never asked for an opportunity to further challenge the reliability of the software used to produce the enhanced videotape. Since the claim was unpreserved in the trial court, appellate counsel cannot be faulted for failing to advance a claim that the appellate court certainly would have declined to review.

### 3. Failure to argue denial of right to confrontation at suppression hearing

Sampson argues that he was denied his Sixth Amendment right to confrontation at the

suppression hearing because the police officers were permitted to testify regarding their interviews with the identification witnesses, but the witnesses did not testify personally. Under New York and federal law, hearsay is admissible at suppression hearings. *E.g., People v. Parris*, 83 N.Y.2d 342 (N.Y. 1994) ("[P]robable cause can be established at the suppression hearing . . . by hearsay information[.]") (citing, *e.g.*, *Draper v. United States*, 358 U.S. 307, 311-312 (1959)); *United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."). Appellate counsel cannot be found ineffective for failing to assert this claim, which had no likelihood of success on appeal.

In sum, Sampson has failed to show that he was prejudiced in any way by appellate counsel's omission of these non-meritorious arguments on appeal. The Court has reviewed appellate counsel's thorough and well-written brief, and it is evident that Sampson received constitutionally adequate representation on his direct appeal.

## CONCLUSION

For the reasons stated above, Lionel Sampson's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Sampson has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:   August 23, 2005
         Rochester, New York.